UNITED STATES ex rel. RAY, U. S. Atty., v. PORTER, Commissioner of Finance of Idaho    (two cases).

District Court, D. Idaho, S. D.    December 30, 1927.

Nos. 1248, 1296.

1. Banks and banking ⟨⟩80(7)—Postal funds deposited by postmaster in state bank held "debts due United States," within priority statute (31 USCA §§ 191, 192; 39 USCA §§ 46–48).

Moneys derived from post office business, deposited by postmaster in state bank, though deposited at his own risk under Rev. St. §§ 3847, 3848 (39 USCA §§ 47, 48), and unpaid draft purchased by postmaster with such funds, held, in view of section 3846 (39 USCA § 46), "debts due the United States," within sections 3466, 3467 (31 USCA §§ 191, 192), giving priority to debts due United States in case of insolvency.

2. Banks and banking ⟨⟩80(7)—Closing of bank and taking over control by state officer held voluntary assignment for benefit of creditors, and "act of bankruptcy," within priority statute (31 USCA § 191).

Where president and cashier of state bank, in which moneys of United States were deposited, closed bank and allowed state officer to take immediate charge, held, that it constituted a voluntary assignment for benefit of creditors, and hence there was committed an act of bankruptcy, within meaning of Rev. St. § 3466 (31 USCA § 191), thus making state officer trustee for United States, and giving United States priority.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Act of Bankruptcy.]

3. United States ⟨⟩76—Statute giving debts due United States priority must be liberally construed (31 USCA § 191).

Rev. St. § 3466 (31 USCA § 191), giving debts due United States priority in cases of insolvency, must be liberally construed.

4. Banks and banking ⟨⟩80(7)—Right of United States to priority of its debts in case of insolvency cannot be governed by state laws (31 USCA § 191).

That assets of state bank, in which postal funds were deposited, are being administered by commissioner under state law, does not affect right of United States to priority, under Rev. St. § 3466 (31 USCA § 191), nor would United States, in asserting its rights, be governed by state law or state courts.

**5. Banks and banking ⬤⟿80(7)—Closing of bank by majority of directors and liquidation by state officer held an "act of bankruptcy," within priority statute (31 USCA § 191).**

Where state bank, containing deposits of United States money, was closed by majority of board of directors and taken over by state officer for liquidation, *held*, that it made a voluntary assignment for benefit of creditors, and thereby committed an act of bankruptcy, within meaning of Rev. St. § 3466 (31 USCA § 191), giving priority to debts due United States in cases of insolvency.

**6. Banks and banking ⬤⟿80(10)—United States, having priority in state bank's funds, is entitled to injunction preventing state officer, liquidating bank from making any payments until United States is paid (31 USCA § 191).**

Where state officer, in charge of insolvent bank having deposits of United States money, to which United States has priority under Rev. St. § 3466 (31 USCA § 191), paid other creditors in preference to United States, latter is entitled to injunction against further payments, and a personal judgment against state officer, if funds are insufficient to satisfy claim of United States.

In Equity. Separate suits, tried together, by the United States, on the relation of H. E. Ray, United States Attorney for the District of Idaho, against E. W. Porter, Commissioner of Finance of the State of Idaho. Decree for plaintiff.

See, also, 19 F.(2d) 541; 24 F.(2d) 137.

Sam S. Griffin, Asst. U. S. Atty., of Boise, Idaho, and Charles S. Brothers, Asst. Sol. Department of Agriculture, for plaintiff.

John R. Becker, of Lewiston, Idaho, for defendant.

CAVANAH, District Judge. Separate suits were begun by the United States against the defendant as commissioner of finance of the state of Idaho, to establish a preference right to payment on account of certain deposits of moneys derived from the business of post offices at Orofino and Caldwell, Idaho, made by the postmasters of the United States. The causes were tried at the same time to the court without a jury, presenting substantially the same questions which will be disposed of in this opinion.

No. 1248 involves transactions between the postmaster of the United States at Orofino and the Fidelity State Bank, whose affairs the defendant, as an officer of the state, is liquidating. Considerable testimony was taken, and the case is to be determined upon the pleadings and evidence. Pursuant to the laws of Idaho, the predecessor of the defendant, as commissioner of finance of the state,

in the performance of his duty as such officer, shortly after the bank had been closed, took possession and control of its property and business for the sole purpose of liquidation. On April 8, 1921, the cashier of the bank, after informing its president as to its condition, upon order of the president closed its doors and posted thereon a notice reciting: "By order of the board of directors this bank is closed."

Prior to and at the time of the closing of the bank, P. M. Malloy, the United States postmaster at Orofino, deposited therein, as such postmaster, certain moneys derived from the business of the post office, and being moneys belonging to the United States. The postmaster, on April 1, 1921, purchased of the bank, with postal funds, a draft in the amount of $156.25, payable to the United States postmaster at Spokane, Wash., in settling his accounts with his depositary office, and which was, upon presentation for payment, refused by reason of the closing of the bank. At the time the bank closed there was also on deposit therein, in the name of "P. M. Malloy, P. M., address, Orofino, Idaho," the sum of $201.84. Immediately after the commissioner took over the bank he caused to be made a complete examination of its condition, and between April 9 and 30, 1921, reported that its condition was such that during the course of collection, shortly after closing, it became certain that the assets were insufficient to pay in full its liabilities, and which was admitted in defendant's answer as of date of the filing of the bill. Nothing has been paid to the general creditors.

P. M. Malloy, as such postmaster, thereafter, on July 1, 1921, filed with the defendant two claims, one for $201.84, covering the balance on deposit to his account as postmaster, and the other covering the amount of the draft for $156.25. These claims recite that the bank is indebted to him as "postmaster" in the amounts therein stated, and that they are entitled to priority in payment. The claims were allowed by the commissioner as unpreferred. It seems that on May 29, 1927, P. M. Malloy filed with the defendant another claim covering these two items, and recited therein that he did so for and on behalf of the United States, and claimed that they were due the United States. This last claim was assigned to the Postmaster General.

Upon the record, plaintiff claims that the items in question were the property of the United States, and that under R. S. § 3466 (31 USCA § 191), they should be paid in full out of the bank's assets prior to any pay-

ment of other creditors of the bank. The defendant denies priority and says that the claim should only be allowed as one not preferred; hence this suit is brought to enforce priority.

The provisions of the statutes of the United States pertinent are:

"Sec. 3466 (R. S.). Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." 31 USCA § 191.

"Sec. 3467 (R. S.). Every executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts, before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate for the debts so due to the United States, or for so much thereof as may remain due and unpaid." 31 USCA § 192.

[1] The first inquiry for solution is whether or not the funds on deposit in the bank, and the draft, were funds of and debts due the United States? Postmasters are permitted to deposit temporarily in their official capacity, and at their own risk, in either national or state banks, where there is no treasurer or designated depositary, moneys belonging to the government. R. S. §§ 3847, 3848 (39 USCA §§ 47, 48), and Postal Laws and Regulations (1913) § 363. These moneys were at all times subject to the orders of the Postmaster General to be transferred or paid out (R. S. § 3846 [39 USCA § 46]), and obviously belonged to the United States. The unpaid draft for $156.25, which was purchased by the postmaster with moneys of the government, is recoverable, if the bank was insolvent or committed an act of bankruptcy, as a prior debt due the United States, although his claim was filed with the commissioner by the postmaster and afterwards assigned by him to the Postmaster General. United States v. Brock, State Bank Comm'r. (D. C.) 5 F.(2d) 265.

These claims specifically state that they were filed by Malloy as postmaster, and, as has been said, represented funds of the United States. Because a postmaster deposits funds in an unauthorized bank, and does so "at his own risk," does not change the character of the funds from public moneys of the government, as the money still remains the property of the United States, although the postmaster has to account to the government. The liability upon the part of the postmaster would not deprive the government of the right to assert its claim as owner of the money, for once it became the property of the United States, it always remained such until it had parted with its interest therein. United States v. Adams (D. C.) 9 F.(2d) 624, 626.

The evidence is clear that the moneys actually deposited in these banks, representing the balance and the purchase of the draft, were from time to time solely derived from the business of the post office, and were so deposited by and carried upon the books of the bank, with its knowledge that the same were funds of the United States. They were at times withdrawn for purposes in connection with the operation of the post office, and were recognized as such funds by the defendant and the department of finance of the state in the liquidation schedule. The debt in question here was due from the bank to the United States.

The next contention which is principally urged by the plaintiff is that, as the deposits made in the bank by the postmaster and the amount represented by the draft were government moneys, priority of payment is given to the United States under section 3466, and whenever it appears that a voluntary assignment for the benefit of creditors was made by the bank an act of bankruptcy was committed, as defined by said section, and, that being the case, insolvency in fact is not necessary to be established at the time of the closing of the bank. Insolvency may be shown in any of the ways stated in the act, and it extends to all debts due from insolvent debtors to the United States. It may exist in one of two ways: First, where a debtor in fact is unable to pay his liabilities on account of insufficiency of assets; and, second, as provided in the latter part of the section, where an act of bankruptcy is committed by the debtor in making a voluntary assignment of his property for the benefit of his creditors. In such case insolvency becomes manifest.

Fairly stated, the evidence discloses that the bank at Orofino was a correspondent of the bank at Clarkston, Wash., and both were controlled by the same president, who at, or immediately subsequent to, the closing of the

Clarkston bank, directed the cashier of the Orofino bank to close the bank at that place. The commissioner of finance was at once notified, and two days thereafter he took charge and posted a second notice, dated the day the bank closed, in which it was stated: "This bank is now in the hands of the department of finance of the state of Idaho. J. G. Fralick, Commissioner of Finance." It had, prior to that time, continually allowed its reserve to fall below the amount required by law, and was failing to meet its liabilities as they became due in the regular course of business. The conditions disclosed by the special examination made by the commissioner about the time of its closing, required action upon the part of the commissioner, who, about two days thereafter, took 'possession of it and posted the second notice, which was done irrespective of the action taken by its president and cashier. Here we have an official of the state, clothed with authority under the state law, stepping in about two days after the officers of the bank had closed its doors and taking charge of its affairs, and shortly thereafter discovering a condition of insolvency existing. Such condition still exists, as it is conceded that its assets have turned out to be less than the debts. The creditors were then entitled to have the assets dealt with as a trust fund.

It would seem that the case of Price v. United States, 269 U. S. 492, 502, 46 S. Ct. 180, 182 (70 L. Ed. 373), is decisive of this case, as we find there that the Supreme Court clearly states that although the complaint alleges in fact that the defendant was solvent, yet if the facts indicate that the corporation was in failing condition, and it was, shortly after the receiver was appointed, found to be insolvent, and that its assets turned out to be insufficient to pay its liabilities, that is sufficient to entitle the United States to its priority right. Mr. Justice Butler there says:

"While in effect the complaint alleged that defendant was solvent, the facts set forth indicate that it was in a failing condition. And it was found to be insolvent within a short time after the appointment of the receiver. When the assets turned out to be less than the debts, the creditors were entitled to have them dealt with as a trust fund and distributed among them according to their rights and priorities. Under the statute, claims of the United States must first be satisfied."

To the same effect, see Stripe v. United States, 269 U. S. 503, 46 S. Ct. 182, 70 L. Ed. 379; Bramwell v. U. S. Fidelity & Guaranty Co., 269 U. S. 483, 46 S. Ct. 176, 70 L. Ed. 368.

The act of the bank's president and cashier, in closing it and allowing the state officer to take immediate charge and continue liquidating its affairs, made the bank's insolvency notorious, and the directors and stockholders, not objecting, but permitting and apparently cooperating and consenting thereto, thereby acquiesced in the voluntary assignment so made. They knew that the actions of their president and cashier would result in passing complete control to the commissioner. This creates a state of insolvency within the meaning of section 3466, and, where an estate is indebted to the United States, the officer taking over the property is made a trustee for it and is bound to satisfy the debts due the United States first. United States v. Butterworth-Judson Corp., 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 404.

In the memorandum decision of Judge Dietrich on motion to dismiss the bill in the present case, after referring to the Price and other cases, it is stated:

"A careful review and analysis of these cases may also be found in an unreported decision by District Judge Elliott in the case of United States v. First State Bank of Phillip, S. D., 14 F.(2d) 543 (July 22, 1926). In view of these decisions I am inclined to think the bill states facts sufficient to entitle the plaintiff to relief. They seem to establish the principle that it isn't essential to constitute an act of bankruptcy that the estate of an insolvent bank be formally assigned to the state officer who is authorized by law to liquidate insolvent banking institution. From them all I gather that if, either with affirmative formal action upon the part of the governing body of the insolvent institution, or with the acquiescence of the board of directors and stockholders, the estate is taken possession of and administered by the state officer, that fact is sufficient to bring the case within the intent and meaning of section 3466. In that view the complaint states facts sufficient."

[2, 3] After viewing all of the evidence, I am also unable to arrive at any other conclusion than that the acts of the officers of the bank, as related, constituted a voluntary assignment of its property for the benefit of its creditors, and in doing so they committed an act of bankruptcy, which present conditions for the application of the priority act, as defined by the late decisions of the courts. The act is to be liberally construed. The language is general and without qualification. Lewis v. United States, 92 U. S. 618, 23 L. Ed. 513. A fair construction of its provisions, under the late decision of the Supreme

Court, is that whenever there exists either insolvency in fact or an act of bankruptcy having been committed, and a debtor, whose assets are insufficient to pay his debts in full, is divested either by voluntary surrender of his property or acquiescence in the possession and administration of such estate in the interest of creditors by an authorized state officer, such person becomes insolvent and the officer taking over the property, where the estate is indebted to the United States, becomes a trustee for it and is bound to satisfy first debts due the United States.

Counsel for the defendant calls attention to the fact that, as no formal resolution of the board of directors of the bank, authorizing its closing, was adopted, there could not be a voluntary assignment to the state officer to liquidate its affairs. It is sufficient to say that, as related, the bank having been in a failing condition and closed by its president and cashier, whose act was not objected to by its directors and stockholders, but acquiesced in by them, the bank thereby ratified and became bound by such act. Pettengill v. Blackman, 30 Idaho, 241, 255, 164 P. 358.

[4] With respect to the contention of the defendant that exclusive jurisdiction over the liquidation of state banks and distribution to creditors is vested by the laws of the state in the state court, and that after the postmaster, who, it is claimed, is the real party in interest, has filed these claims with the commissioner and submitted them to the state court upon appeal, the United States must abide the result, it appears from the evidence that the appeal taken by the postmaster from the order of the commissioner was withdrawn, and that there was not, at the time of the trial of the present case, any proceeding concerning these claims pending in the state court. This fact was established on cross-examination of one of the witnesses for the government by counsel for defendant, and no testimony was offered contradicting the same.

As has been said, the moneys in question were the property of the United States, who is the real party in interest, and not the postmaster. Therefore the postmaster would have no authority to subject the United States to the jurisdiction of the state court, nor to deprive it of its right of action under section 3466. The mere fact that the bank's assets are being administered by the commissioner under the state law does not affect such right of action under section 3466, and the United States, in asserting its right, would not have to depend upon or be governed by any procedure prescribed by the state law,

nor would it have to appeal to the state court from the order of the commissioner disallowing priority of its claim. It is clear that this right is not open to dispute, as the Supreme Court, in referring to this act, said:

"The right to priority of payment provided for by Rev. Stats. § 3466, attaches when the conditions specified by the section come into existence; and it cannot be impaired or superseded by a state law." United States v. Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638; Liberty Mut. Ins. Co. v. Johnson Shipyards Corp. (C. C. A.) 6 F.(2d) 752.

It is quite clear, after a reading of the case of United States v. Bernstein (C. C. A.) 16 F.(2d) 233, that it is not authority in support of the claim of the defendant that this court is without jurisdiction in the present case, as there the proceeding was originally instituted in the bankruptcy court under the National Bankruptcy Act (11USCA), and wherein Bernstein was adjudicated a bankrupt, and the United States claimed that its claim for federal taxes should be paid before exemptions were set aside to the bankrupt. The court merely held that, when the United States enters one of the courts of the United States as a litigant, in a proceeding involving questions under the National Bankruptcy Act, it is bound by that act, and "it lays aside its power, and to the same extent as other litigants must conform to court rules." The other citation of the case of McFarland v. Denny & Co., 23 F.(2d) ——, which appears in the memorandum opinion of Judge Dietrich, was a controversy between the parties concerning a claim of lien upon some of the assets of the receivership estate, which was pending in the state court, and did not involve any right of the United States under a federal law giving the federal courts jurisdiction.

[5] No. 1296 presents transactions occurring between the postmaster of the United States at Caldwell, Idaho, and the Western Commercial Bank of that city, in connection with deposits made by the postmaster in the bank of postal funds of the government in the amount of $1,998.27, and $700 derived from money orders which were deposited in the bank; that thereafter two checks of the postmaster, aggregating $700, were sent to the postmaster at Boise, covering the money orders, which were not presented for payment before the bank closed. The history of these transactions is somewhat similar to those involved in case No. 1248. After closing of the bank the postmaster notified the Third Assistant Postmaster General thereof, and

under instructions received he filed with the defendant, using the form furnished by the Post Office Department, a claim on behalf of the United States, which stated it was for postal funds and claimed priority of payment. This claim was allowed by the department as unpreferred. The bank was closed December 23, 1925, and a notice was posted on its door, signed by six of its nine directors, as follows:

"This bank has placed its affairs and assets under the control of E. W. Porter, Commissioner, Department of Finance, State of Idaho.

"Dated this 23d day of December, 1925.
"John C. Rice, Director.
"J. H. Lowell, Director.
"I. M. McCarthy, Director.
"Chas. B. Howard, Director.
"E. H. Plowhead, Director.
"C. D. Rush, Director."

It seems that, shortly before the closing of the bank, an examiner of the defendant's department made an examination of its affairs, and had determined, by admissions of the board of directors and from other sources, that losses were sustained sufficient to wipe out its capital, surplus, and undivided profits, and render it insolvent. However, the bank was not then closed, but its directors sought financial assistance, and failing, four of them, on December 22, 1925, decided to close the bank, and they, with two other directors, signed the notice and placed it on the door at about 8 o'clock of the morning of December 23d. The defendant was at once notified, and about 10:30 a. m. of the same morning, an examiner, representing the defendant's department, was sent to take charge, and he posted another notice on the door, as follows:

"The affairs of the Western Commercial Bank, Caldwell, Idaho, are in the hands of the Department of Finance, Bureau of Banking, State of Idaho, for liquidation.

"Posted 10:30 a. m., December 23, 1925.
"E. I. Canfield, Examiner in Charge."

Neither the directors nor the stockholders have at any time objected or taken any steps to prevent the liquidation of the bank by the defendant. About three months after its closing, the defendant filed in the state court an application for authority to sell the assets of the bank, and alleged therein that the directors had regularly placed its affairs and assets in his hands for liquidation, and also alleged that at that time, and on December 23, 1925, it was insolvent, and prayed for an order allowing him to sell assets of $751,937.95 for $264,760.59, the highest amount bid. Thereafter, at a meeting of the board of directors, on February 16, 1926, the act of closing the bank was confirmed.

It does not appear that there were any receivership or other proceedings pending in the state court as to the administration of the banks, or either of them, other than the application for an order to sell the assets. These banks are in charge of and being liquidated by the defendant, as an officer of the state under the state laws, and are not being liquidated under any proceedings in or order of the state court. It will thus be seen that this bank was closed by a majority of its board of directors, which satisfies the requirement of the statute. Sess. Laws Idaho 1921, c. 42, § 2.

The proof in this case further shows that, not only was the bank insolvent at the time it was closed, and continued so to be, but it made a voluntary general assignment of its property to the defendant for the benefit of its creditors, and thereby committed an act of bankruptcy within the meaning of R. S. § 3466. The board of directors not only initiated the steps taken, in turning over the bank's property and affairs to the state officer for liquidation, but they and the stockholders have never objected to, but by their acts have acquiesced in, the assignment.

[6] It further appears that the defendant, since taking charge of these two banks, and in the course of their liquidation, had sufficient moneys of the assets of the banks to pay in full the claims of the United States, but he has paid other creditors in preference to the United States; therefore the plaintiff is entitled to an injunction preventing the defendant from making other payments out of the assets of these banks until the United States is paid, and a decree directing the payment of plaintiff's claims, with interest, in preference to general creditors of the banks, and, in the event the same cannot be satisfied out of the funds of the banks now, a personal judgment will be entered in each case against the defendant in the amounts prayed for in the bills of complaint.